**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

STATE OF KANSAS, *ex rel*.,
KRIS W. KOBACH, Attorney General,

                     Plaintiff,

      v.

MACQUARIE ENERGY LLC,

                    Defendant.

**Civil Action No.: 5:23-cv-4116**

**COMPLAINT**

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION AND OVERVIEW ................................................................. 1

II.  JURISDICTION AND VENUE ......................................................................................... 5

III. PARTIES .......................................................................................................................... 6

   A.   Plaintiff ..................................................................................................................... 6

   B.   Defendant .................................................................................................................. 6

   C.   Relevant Nonparties .................................................................................................. 8

IV.  ALLEGATIONS COMMON TO ALL CLAIMS ............................................................ 10

   A.   Natural Gas Markets and Trading ........................................................................... 10

      1.   Basic Organization of the Natural Gas Market:  Production, Transportation, Distribution and Consumption ............................................................................ 10

      2.   Natural Gas Markets and Trading ....................................................................... 12

   B.   Platts Benchmark Prices for Natural Gas ................................................................ 14

   C.   The Southern Star Location and its Benchmark Southern Star Gas Daily Price ........ 17

   D.   Financial Gas Products (Natural Gas Derivatives) Tied to the Southern Star Gas Daily Price ............................................................................................................... 20

   E.   The Southern Star Gas Daily Price is Highly Susceptible to Manipulation ............... 21

   F.   Winter Storm Uri and Gas Daily Prices .................................................................. 22

V.   MACQUARIE ENTERS INTO THE TRADE TO MANIPULATE THE SOUTHERN STAR GAS DAILY PRICE IN VIOLATION OF THE CEA ............................................ 23

   A.   Macquarie's February 16, 2021 Trade Was Incorporated into the February 17, 2021 Southern Star Gas Daily Price ...................................................................... 23

      1.   Macquarie Entered into the Trade on February 16, 2021 ..................................... 23

      2.   The Trade was Incorporated into the February 17, 2021 Southern Star Gas Daily Price ........................................................................................................... 24

   B.   The Trade Materially Altered the February 17, 2021 Southern Star Gas Daily Price   24

   C.   The February 17, 2021 Southern Star Gas Daily Price was an Artificial Price .......... 24

1.   The Trade's Price Did Not Reflect, and was Disconnected From, Prevailing Market Forces and Supply/Demand Factors ........................................................ 24

2.   Market Participant Concerns with Natural Gas Prices During Winter Storm Uri Have Singled Out the February 17, 2021 Southern Gas Daily Price .................... 26

D.   Macquarie Possessed the Ability to Influence Southern Star Gas Daily Prices and Caused the Artificially High February 17, 2021 Southern Star Gas Daily Price ....... 28

1.   Macquarie Possessed the Ability to Influence Southern Star Gas Daily Prices ... 28

2.   Macquarie Intentionally Caused an Artificially High February 17, 2021 Southern Star Gas Daily Price .......................................................................................... 30

E.   Macquarie's Extraordinary Profits from February 2021 Gas Transactions Utterly Transformed MGL's Fiscal 2021 Results .................................................................. 31

1.   On February 9, 2021, Just Days Prior to Winter Storm Uri, MGL Warned that it Expected Fiscal 2021 Profits to Decline ............................................................. 31

2.   On February 22, 2021, Just Days After Winter Storm Uri and Less Than Two Weeks After Warning that Profits Would Decline, MGL Revised its 2021 Profit Outlook to a 10% *Increase* .................................................................................. 32

3.   Macquarie's Natural Gas Trading During Winter Storm Uri Generated Net Profits to MGL Nearing $A1 Billion and Reversed the Earnings Warning .................... 32

VI.   MACQUARIE'S MANIPULATION HARMED KANSAS RESIDENTS ......................... 37

A.   Macquarie's Manipulation Forced Kansas Residents to Pay More for Natural Gas .. 37

B.   Macquarie's Manipulation Harmed Traders of Southern Star Derivatives ................ 39

VII. CLAIMS FOR RELIEF ..................................................................................................... 39

VIII. PRAYER FOR RELIEF ................................................................................................... 43

IX.   JURY TRIAL DEMANDED ............................................................................................ 44

Plaintiff, State of Kansas, *ex rel.* Kris W. Kobach, Kansas Attorney General, by and through counsel Frances R. Oleen, Deputy Attorney General, petitions this Court for relief against Defendant Macquarie Energy LLC ("Macquarie"), pursuant to the Commodities Exchange Act, 7 U.S.C. §§ 1 *et seq*. and the Kansas False Claims Act, K.S.A. § 75-7501 *et seq*., for its causes of action against Defendant. Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, Plaintiff's counsel's investigation, which includes, without limitation, review and analysis of:

(a) natural gas transactions providing for physical delivery of natural gas during February 2021 at various Mid-Continent locations, including but not limited to Southern Star, and documents associated with such transactions (such as trade confirmations, invoices for February 2021, and other communications);

(b) proceedings before utility regulators of various states, including the Kansas Corporation Commission ("KCC"), concerning natural gas markets and pricing during Winter Storm Uri, and the excess costs experienced by utilities and like regulated entities arising from elevated natural gas prices during that period;

(c) further information and documents obtained or subpoenaed by Plaintiff in the course of its investigation; and

(d) other publicly available information concerning natural gas markets during February 2021 or Macquarie.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.     This lawsuit seeks redress under, among other things, the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq*., and the Kansas False Claims Act, K.S.A. § 75-7501 *et seq*., for Macquarie's manipulation of a key natural gas benchmark price for Kansas and its residents –

the Southern Star Gas Daily price.  For Kansas residents, that benchmark price (1) sets many of the prices for "physical" natural gas transactions (involving actual delivery of natural gas from seller to purchaser) that impact natural gas purchased by or for Kansas residents, and (2) forms the basis for many "financial" natural gas transactions (certain natural gas derivative products, such as futures, swaps and options, specified herein) pertaining to natural gas for Kansas residents traded on futures exchanges operated by Intercontinental Exchange, Inc. ("ICE").

2.     Macquarie is one of the largest natural gas marketers in the United States, including in the Mid-Continent region that includes Kansas and nearby states[1] (and within that region, the Southern Star Gas Central Pipeline ("Southern Star"), which is centered in Kansas).  In the Mid-Continent and the Southern Star location, Macquarie sells very large volumes of natural gas – in both absolute and relative terms – to local distribution companies (state gas utilities and similar regional or municipal entities), electric power generators, large commercial or industrial entities, and other market participants, including other natural gas marketing companies.  Many of these sales were transacted at prices based on a Mid-Continent region benchmark price – the Southern Star Gas Daily midpoint price (the "Southern Star Gas Daily price") – calculated daily by S&P Global Platts ("Platts"), as further detailed herein (Sections IV.B-C, *infra*).

3.     Platts calculates gas daily prices daily for dozens of locations, including Southern Star. These Gas Daily prices represent average natural gas "spot" market prices for each location. *Id*. For each location, Platts determines a Gas Daily price by (1) reviewing fixed-price natural gas

---

[1] In terms of natural gas, the Mid-Continent (sometimes written as Midcontinent) Region includes at least portions of the following pipelines: ANR, Enable Gas, Natural Gas Pipeline Co. of America (NGPL), ONEOK, Panhandle, Southern Star, and Texas Eastern that at have been grouped together because of their proximity. *See* Platts, "Methodology and Specifications Guide:  US and Canada Natural Gas," *Platts* (updated Jan. 2023) (hereinafter, "Platts Methodology"), available at: https://www.spglobal.com/commodityinsights/PlattsContent/_assets/_files/en/our-methodology/methodology-specifications/us_canada_gas.pdf.

trades to deliver gas the next day at that location and (2) calculating the volume-weighted average price of such trades, which become the Gas Daily benchmark price. *Id*. The Southern Star Gas Daily price is thus determined based on prior-day natural gas trades at fixed prices, providing for next-day gas delivery at Southern Star locations.

4.     In mid-February 2021, a significant winter storm – Winter Storm Uri – disrupted natural gas markets, increasing demand for natural gas while decreasing its supply and causing prices to rise.  At various Mid-Continent and nearby locations, natural gas spot market benchmark prices doubled, tripled, rose ten-fold, and even, in certain locations for a short time, rose 100-fold. During a February 13-16, 2021 price peak, benchmark Mid-Continent natural gas prices, which at February's beginning were approximately $2.50/MMBtu, rose to approximately $200-$300/MMBtu.[2]

5.     Aggravating an already stressed market, on the morning of February 16, 2021, Macquarie entered into an economically irrational natural gas trade, purchasing natural gas for next-day delivery within Southern Star at the **single highest price ever paid for Southern Star natural gas** (the "Trade").  No one has ever paid more.  Indeed, **no one has ever paid any fixed price for Southern Star gas even remotely close to what Macquarie agreed to pay**. The fixed price Macquarie agreed to pay on February 16, 2021, for February 17, 2021 Southern Star natural gas is – and at the time of its transaction (and delivery) was – an outlier:  far above and disconnected from all other contemporary Southern Star transaction prices or Macquarie transactions.  *See* Section V.C.1, *infra*.

6.     Counterintuitively, the Trade was not a fiasco for Macquarie, but instead a resounding financial success – because the actual effect of Macquarie's Trade was to manipulate

---

[2] Natural gas volumes are expressed in units termed millions of British thermal units ("MMBtu").

the February 17, 2021 Platts Southern Star Gas Daily price dramatically upwards.

7.      The Southern Star Gas Daily benchmark is uniquely susceptible to manipulation. Because the Platts' Gas Daily price distills volume-weighted price averages from prior-day fixed-price gas transactions, the relatively small numbers of qualifying trades on Southern Star and the relatively lower daily volume of those trades on Southern Star than at all or nearly all other Mid-Continent locations means that a single trade can have a significant impact.   Therefore, manipulative activities that impact the Southern Star benchmark can have a greater effect there than at most or all other Mid-Continent locations. *See* Section IV.E, *infra*.

8.      Here, the Trade produced an enormous manipulative effect on the benchmark. The February 17, 2021 Southern Star Gas Daily price increased by hundreds of dollars per MMBtu solely because of the single manipulative trade.  *See* Sections V.A-B, *infra*.

9.      The Trade generated material additional trading revenues for Macquarie.  *See* Section VI, *infra*.

10.     The price spike in the February 17, 2021 Southern Star Gas Daily caused by the Trade dramatically increased costs for any entity purchasing Southern Star natural gas tied to the benchmark on that day.

11.     The Trade raised the price Kansans paid for any gas deliveries priced based on the benchmark, imposing material additional costs on Kansas residents.  *See* Section VI, *infra*.  The Trade also damaged traders of financial gas instruments whose prices, value, and settlement were linked to the February 17, 2021 Southern Star Gas Daily price.

12.     Following Winter Storm Uri, market participants and observers expressed concerns over possible manipulation of Mid-Continent natural gas prices during Winter Storm Uri. They singled out the February 17, 2021 Southern Star Gas Daily price, in particular, as a locus of

potential manipulation.  *See* Section V.C.2, *infra*.

13.     Macquarie's February 16, 2021 behavior and Trade were economically irrational and contrary to its self-interest as a natural gas marketer. The only logical explanation is that the Trade was an intentional effort to manipulate the February 17, 2021 Southern Star Gas Daily price.

14.     Plaintiff brings the claims against Macquarie asserted here on behalf of Kansas residents to the fullest extent allowed by the CEA and the Kansas False Claims Act.

## II.     JURISDICTION AND VENUE

15.     Southern Star natural gas is a "commodity" in interstate commerce. It is a "commodity underlying" Southern Star derivatives contracts, as those terms are defined and used in Section 1a(9) of the CEA, 7 U.S.C. § la(9).This Court has subject matter jurisdiction under 7 U.S.C. § 13a-2, 28 U.S.C §§ 1331, 1337. This Court has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367.

16.     This Court has personal jurisdiction over the Defendant because the Defendant's wrongful acts include acts committed in this District and because the Defendant does business in the State of Kansas.

17.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction in this judicial district, and this is the District in which events giving rise to the claims occurred or where Defendant's unlawful acts manipulated the prices of physical and financial natural gas contracts and derivatives occurred.

18.     Plaintiff may bring this action under Section 6d of the CEA, 7 U.S.C. § 13a-2. This statute allows authorized State officials to bring proceedings for alleged violation of the CEA's provisions or any rules, regulations, or orders promulgated thereunder whenever it appears to the state attorney general that the interests of the residents of the state have been, are being, or may be threatened or adversely affected by violations of the CEA or Commodity Futures Trading

Commission ("CFTC") Regulations. Plaintiff, as Kansas Attorney General, is an authorized state official within the meaning of the CEA, pursuant to 7 U.S.C. §13a-2(1).

19.    Under K.S.A. § 75-7504, the Attorney General of the State of Kansas is permitted to investigate a violation of the Kansas False Claims Act and, if a violation is found, may bring a civil action under that section against the entity responsible for the violation.

## III.    PARTIES

### A.    Plaintiff

20.     Kris Kobach is the duly elected, qualified, and acting Attorney General for the State of Kansas.

21.    In the aftermath of Winter Storm Uri's impact on the State of Kansas, the Office of the Attorney General investigated natural gas pricing during the storm (the "Investigation").

### B.    Defendant

22.    Defendant Macquarie Energy LLC is a company incorporated under the laws of Delaware with principal offices located at 500 Dallas Street, Suite 3300, Houston, Texas 77002. Macquarie is one of the five largest natural gas marketers in North America.  During the first quarter of 2021, the time period of central relevance here, Macquarie was the second-largest gas marketer in North America, delivering 11.2 billion cubic feet of natural gas each day.

23.    Macquarie's natural gas marketing group employed over 110 traders, schedulers, and support personnel, mostly located in Houston, Texas, and organized into four regional natural gas trading desks (East, Mid-Continent, West, and Gulf) and a natural gas scheduling desk. The gas trading desks engage in physical and financial trading of natural gas and provide transportation, storage, and other services to gas producers, marketers, utilities, electric power generators, and other customers.

24.    Macquarie's Mid-Continent Gas Desk buys and sells natural gas at wholesale for

delivery in Kansas (and other nearby states) with counterparties including (1) natural gas producers (from whom Macquarie purchased gas); (2) local distribution companies (natural gas utilities), power generators, municipalities and cooperatives, and large commercial or industrial entities (to whom Macquarie sold gas); and (3) other natural gas marketers and trading organizations (with whom Macquarie operated as both a buyer and seller of natural gas).

25.    During the relevant period, Macquarie (1) transacted business in the State of Kansas; (2) had substantial contacts with the State of Kansas; and (3) committed substantial acts in furtherance of the manipulative scheme alleged herein in the State of Kansas. In addition, Macquarie's conduct was directed at and had the effect of causing injury to persons residing in, located in, or doing business in the State of Kansas.

26.    Defendant Macquarie registered with the CFTC, pursuant to and under the CEA, through the CFTC's registration vendor, the National Futures Association, on or before December 31, 2012.[3] Defendant Macquarie remained registered with the CFTC during Winter Storm Uri and through May 29, 2021.[4]

27.    Macquarie is a wholly-owned subsidiary of Macquarie Bank Limited, which in turn is a wholly-owned subsidiary of Macquarie Group Limited ("MGL"), an Australian multinational investment bank and financial services company employing over 16,000 people across 32 markets worldwide. As of March 31, 2021, MGL had $428.5 billion in assets under management worldwide and a net operating income of $9.7 billion.  Macquarie is the North American energy marketing and trading arm of MGL's Commodities and Global Markets division ("CGM").

---

[3] Nat'l Futures Ass'n, NFA Basic Macquarie Energy LLC, NFA, https://www.nfa.futures.org/BasicNet/basic-profile.aspx?nfaid=eS%2B7iR1Ia8I%3D (last visited Nov. 7, 2023) (listing Defendant Macquire Energy LLC as a provisionally registered swap dealer.)

[4] *Id.*

28.     Although Macquarie was one small part of CGM, the amount Macquarie earned from **two weeks** of U.S. natural gas trading in mid-February 2021 was as much as CGM *in its entirety* typically earned in **four years**. *See* Section V.E, *infra*.

29.     Macquarie Trader A was at all relevant times a natural gas trader operating in Macquarie's Mid-Continent Gas Desk.  Macquarie Trader A negotiated and entered into the Trade on Macquarie's behalf. Macquarie Trader A acted as Macquarie's agent when taking the alleged manipulative actions, and Macquarie Trader A's actions were within the scope of Macquarie Trader A's employment at Macquarie.

### C.     Relevant Nonparties

30.     Kansas Gas Service ("KGS") is headquartered in Overland Park, Kansas, and is a wholly-owned division of ONE Gas, Inc., an Oklahoma corporation headquartered in Tulsa, Oklahoma. It is the largest natural gas distribution utility in Kansas, delivering natural gas to more than 640,000 Kansas customers.  Macquarie's manipulation artificially inflated the price that KGS (and its customers thereby) paid for natural gas.

31.     Kansas Municipal Gas Agency ("KMGA") is headquartered in Overland Park, Kansas, and is a not-for-profit interlocal public agency created by its municipal members under the Kansas Interlocal Cooperation Act, KS Stat. §§12-2901 *et seq*. KMGA purchases, schedules, and manages natural gas supply for its 49 member Kansas municipalities by amalgamating their natural gas needs into a single market pool. Macquarie's manipulation artificially inflated the price KMGA (and its customers thereby) paid for natural gas. KMGA is a Kansas political subdivision within the meaning of the Kansas False Claims Act.

32.     Black Hills/Kansas Energy Services Company, d/b/a Black Hills Energy ("Black Hills"), is part of Black Hills Corporation, a South Dakota corporation headquartered in Rapid City, South Dakota. Black Hills provides natural gas service to approximately 117,000 residential,

commercial, and industrial consumers in Kansas.  Macquarie's manipulation artificially inflated the price Black Hills (and its customers thereby) paid for natural gas.

33.     Atmos Energy Corporation ("Atmos"), is a Texas corporation headquartered in Dallas, Texas, and is the largest fully-regulated pure natural gas distribution company in the United States, with six unincorporated gas utility operating divisions.  Atmos's Colorado/Kansas division, headquartered in Denver, Colorado, serves approximately 135,000 Kansas customers – including approximately 125,000 residential customers, 9,800 commercial and public authority customers, 15 industrial customers, 258 irrigation customers, and 450 transportation customers – in 110 communities located in 32 Kansas counties.  Macquarie's manipulation artificially inflated the price that Atmos (and its customers thereby) paid for natural gas.

34.     Midwest Energy, Inc. ("Midwest Energy") is a self-regulated electric and natural gas cooperative headquartered in Hays, Kansas, serving 40,000 gas and 50,000 electric customers in central/western Kansas.  Macquarie's manipulation artificially inflated the price that Midwest Energy (and its customers thereby) paid for natural gas.

35.     Other Kansas entities that provided natural gas to Kansas consumers similarly suffered damages from the manipulated market Defendant caused or created.

36.     S&P Global Platts ("Platts") is a London-based price reporting agency with offices in 35 countries, including the United States. Platts provides benchmark prices for a variety of energy-related products and markets throughout the world, including natural gas. Benchmarks provided by Platts (as well as benchmarks provided by other price reporting agencies) are often used by market participants as a price reference for (1) physical natural gas contracts, whose prices are often set at an agreed-upon benchmark value, plus or minus a negotiated dollar differential (the "spread" above/below the benchmark price); and (2) financial natural gas contracts, where they

serve as the underlying reference price for settlement of natural gas derivatives such as swaps and futures.

## IV.     ALLEGATIONS COMMON TO ALL CLAIMS

### A.      Natural Gas Markets and Trading

#### 1.      Basic Organization of the Natural Gas Market:  Production, Transportation, Distribution and Consumption

37.     Natural gas supplies approximately 29% of the energy used in the U.S.  In addition to serving as the main heating fuel for approximately half of U.S. homes, natural gas is used for electric power generation (as fuel for gas-fired electricity generation plants), as a raw material for paints, fertilizers, and plastics, and to produce items such as steel, glass, paper, clothing, and brick.

38.     The physical market for natural gas comprises the production, transportation, storage, distribution, and consumption of natural gas, summarized below.  Alongside the physical market for natural gas, there are parallel financial markets for natural gas, in which financial products derived from physical natural gas are purchased and sold.  Relevant financial gas markets and products are summarized in Section IV.D, *infra*.

39.     Natural gas producers extract natural gas from gas-rich geological rock formations and transport that gas through "gathering system" pipelines to major interstate gas pipelines, which carry the gas toward end users.

40.     Once produced and processed, natural gas is transported towards end users via an extensive 300,000+ mile network of more than 200 different large diameter (16-48 inches), high-pressure interstate and intra-state gas pipelines ("mainlines") that crisscross North America.  This mainline transportation network includes more than 5,000 points at which gas can be received and more than 11,000 points at which gas can be delivered, as well as more than 1,400 interconnection points between different mainline pipelines, including several dozen major "hubs" where multiple

pipelines interconnect.  The interstate and intra-state pipeline network also includes (1) more than 400 underground natural gas storage facilities connected to the pipelines that increase system capacity and flexibility and (2) smaller-diameter "lateral" lines that carry mainline gas closer to end users.

41.     While some large customers (such as gas-fired electricity generation plants or large industrial customers) obtain gas directly from the large interstate and intrastate pipelines, most customers (including nearly all residences) obtain gas through local distribution companies ("LDCs") – *i.e.*, utilities – which receive gas from a mainline transmission pipeline company and distribute gas to the ultimate consumer (residences, commercial and governmental entities) through a direct network of small-diameter distribution pipelines operated and maintained by the LDCs.  In the U.S., more than 1,300 LDCs maintain more than two million miles of local distribution pipelines.  These LDCs purchase gas at wholesale volumes to supply their customers at retail volumes.

42.     Utilities/LDCs function as local monopolies for gas distribution to most gas end users, and operate under state regulation that ties the rates that LDCs charge to their customers for gas to the costs that LDCs incur to obtain the gas for their customers.  LDCs' gas acquisition costs are thus passed through, via LDC rates, to LDCs' customers.  Nearly all residential end users and many commercial end users obtain gas from LDCs at such regulated rates.  Certain commercial and governmental end-users, however, elect not to obtain gas from LDCs at regulated rates. Instead, these end users purchase gas from local or regional gas marketing companies.  Such end-users are referred to as "transportation" customers. Transportation customers do not pay LDCs for gas supply even though they receive their gas via the LDC's local gas pipeline network. Instead, the LDCs obtain a fee for the access they provide.

43.     Standing in between natural gas producers and the LDCs or natural gas end-users are gas marketers.  Natural gas marketers perform most gas trading in the U.S.  Large, nationally-integrated gas marketers, such as Macquarie, operate nationwide, purchasing large volumes of natural gas from producers (or from other gas marketers) and then marketing and selling that gas to LDCs, electricity generators, large commercial or industrial gas end-users, and other wholesale market participants.

### 2.      Natural Gas Markets and Trading

44.     Although all natural gas is effectively identical, such that gas in California is identical to gas in New York, natural gas trading and pricing is **location-specific**. Natural gas trades always specify the delivery of gas to a **particular location** (typically, a point on a mainline pipeline).  The price of natural gas at that location reflects local supply and demand factors. As a result, the prices at one location can differ from prices for delivery at other locations.  Demand factors can include local/regional weather: on cold days and in areas where winters are cold, natural gas demand may be higher.  Supply factors can include pipeline capacity constraints, the location's proximity to, and pipeline connections with, natural gas-producing basins, relative transportation costs, etc.

45.     Certain locations are more actively traded than most others, including hubs where multiple pipelines interconnect or so-called "city gate" points where mainlines interconnect with LDC distribution systems and other market centers.

46.     Physical natural gas trades specify other key information: the buyer, the seller, the delivery location, the term (the day or days on which gas will be delivered), the volume of gas to be delivered each day during the term (typically expressed in MMBtu units), and the price ($/MMBtu, as discussed below).

47.     Natural gas trades at a fixed price (*e.g.*, $2.50/MMBtu) or based on a benchmark

price for a given location, often termed an "index" price.  In benchmark index-priced transactions, the counterparties agree to purchase/sell gas either (1) at a specified benchmark index price for that delivery location on that delivery date (*e.g*., the Southern Star Gas Daily price for February 17, 2021), or (2) at some level (the "spread") above or below the specified benchmark index price (*e.g*., five cents below, or $5.000 above, the Southern Star Gas Daily price for February 17, 2021).

48.     Currently, approximately 80% of total U.S. natural gas volumes trade based on benchmark index prices, and only approximately 20% at fixed prices.  As discussed in the following sections (*see* Sections IV.A-B, *infra*), benchmark index prices for a given location are based on, and represent the volume-weighted average price of, certain qualifying *fixed-price* transactions at that location.

49.     There are two basic categories of physical gas trades, distinguished by their term and underlying purposes.

50.     First, so-called "term" deals provide for delivery of fixed daily volumes of gas for an entire calendar month (*e.g*., 5,000 MMBtu/day delivered each day of February 2021) or for a multi-month period (*e.g*., a "winter" deal for delivery of 5,000 MMBtu/day delivered each day between November 1, 2020 and March 31, 2021).  Producers use term deals to secure sales or customers for their core production output.  LDCs use term deals to procure core, "baseload" gas supplies.  Typically, term deals are transacted at monthly benchmark prices for the applicable location, in which, as discussed in Section IV.B immediately below, a benchmark price established at the beginning of the month for that location is applied to all deliveries during that month.

51.     Second, so-called "spot" deals typically provide for next-day delivery of gas, either for a single day or for a multi-day period within a calendar month.  LDCs use spot deals to cover demand when baseload supply levels are inadequate to meet projections.  Typically, spot deals are

transacted at *daily* benchmark prices for the applicable location, as detailed in Section IV.B immediately below, or at fixed prices.

52.     For next-day gas to reach its destination on the next day, the standard "timely" market for next-day gas closes at 1:00 pm Central Time.  Trades executed on a "timely" basis are effectively guaranteed, absent extraordinary circumstances, to arrive at the scheduled time on the following day.  However, there are several further standard trade timelines, set forth below, that provide for next-day delivery of certain "evening" trades, as well as same-day delivery trades ("intraday") for arrival in the afternoon, evening, or night.



| Cycle | Cycle Description |
|---|---|
| T | Timely: Nominations sent by 1 p.m. (Central Clock Time), to be confirmed by 4:30 p.m., and to be effective for gas flow starting at 9 a.m. next gas day. |
| E | Evening: Nominations sent by 6 p.m., to be confirmed by 8:30 p.m. for gas flow at 9 a.m. |
| ID1 | Intraday 1: Nominations sent by 10 a.m., to be confirmed by 12:30 p.m. for gas flow at 2 p.m. |
| ID2 | Intraday 2: Nominations sent by 2:30 p.m., to be confirmed by 5 p.m. for gas flow at 6 p.m. |
| ID3 | Intraday 3: Nominations sent by 7 p.m., to be confirmed by 9:30 p.m. for gas flow at 10 p.m. |

53.     Natural gas trades on exchanges, including exchanges operated by ICE and the CME, and through bilateral, "over-the-counter" transactions negotiated and agreed to by buyer and seller counterparties (often through electronic trading and communications platforms or by telephone).

**B.     Platts Benchmark Prices for Natural Gas**

54.     Platts is the primary developer and publisher of benchmark price indices for

physical and financial natural gas.

55.     During 2019, Platts' and other benchmark index prices provided a basis for 82% of total physical natural gas transaction volumes in the U.S.[5]  Fixed prices provided the remaining 18% of total physical natural gas traded in the U.S.  As described below, natural gas benchmark indices are based on natural gas fixed price transactions.

56.     Platts calculates and publishes daily and monthly benchmark index prices for dozens of "locations" (also termed "price points") within eight broader regions of the United States.  Each of these locations, as defined by Platts, generally consists of a particular stretch of interstate natural gas pipeline (or pipelines) or a hub area where multiple pipelines interconnect. As Platts explains, these location-specific benchmark price indices "are designed to produce price assessments and indices that are representative of market value, and of the particular markets to which they relate."[6]

57.     For each location,[7] Platts publishes a daily benchmark index price and a monthly benchmark index price, which inform transactions for natural gas: (1) the "daily" or "spot" market, in which gas is purchased for next-day delivery ("next-day gas"); and (2) the "monthly" or "term" market, in which fixed volumes of gas are procured, sometime before the end of a month, for daily flow on each day during the entire following calendar month (or months) (*e.g.*, 10,000 MMBtu per day for each day of February 2021).

58.     Platts' *daily* benchmark index price – termed the Gas Daily price (and also referred

---

[5] *See* Federal Energy Regulatory Commission, "Actions Regarding the Commission's Policy on Price Index Formation and Transparency, and Indices Referenced in Natural Gas and Electric Tariffs," *Federal Energy Regulatory Commission*, Docket No PL20-3-000, Fed. Reg. 83940, at 83941 (Dec. 23. 2020).

[6] *See* Platts Methodology, at p. 2.

[7] Platts defines each location in the Platts Methodology, at pp. 9-17.

to as the Gas Daily Average, Gas Daily midpoint, or Gas Daily index – and hereinafter, the "Gas Daily" price) – is of primary relevance here.

59.     The Platts Gas Daily price, for any given location, is intended to be – and functions as – a representative "market" price for that location.  Platts Methodology, at 2.  To determine such a representative daily market price for a given location, Platts: (1) on the <u>prior</u> day, reviews certain fixed-price physical natural gas transactions for next-day delivery at that location ("qualifying transactions");[8] and (2) calculates the volume-weighted average price of those transactions, which becomes the following day's Gas Daily price for that location.  *See* Platts Methodology, at 4-5.  For example, the February 17, 2021 Southern Star Gas Daily price was based on Platts' review of February 16, 2021 fixed-price trades for next-day gas delivery to Southern Star.  Pricing for weekends and holidays differs slightly.[9]

60.     Platts publishes final Gas Daily prices for each location, for each day, in a report titled the Platts Gas Daily Report, which Platts issues to subscribers at approximately 5:00 pm Central Time of the prior day (made possible by the 1:00 pm Central Time closing of the next-day natural gas market, *see* n. 8 *supra*.).  *See* Platts Methodology, at 5.  For example, the February 17, 2021 Southern Star Gas Daily price – based on Platts' review of February 16, 2021 fixed-price

---

[8] The fixed-price, next-day transactions reviewed by Platts consist of: (1) transactions reported directly to Platts by market participants who have elected to provide Platts with their natural gas trading data ("Platts price submitters"), and (2) ICE exchange trades and/or other ICE trade data. *See* Platts Methodology, at 4-5.  For gas to arrive on a next-day basis at its specified delivery point, it must be "nominated" (or scheduled) to pipelines no later than 1:00 pm Central Time of the prior day, which marks the close of the next-day gas market.  Hence, the prior-day trades incorporated by Platts into Gas Daily prices are trades executed prior to 1:00 pm Central Time.

[9] For weekends, Friday fixed-price trades are used to determine a Gas Daily price that applies to deliveries on Saturday, Sunday and Monday.  Mid-week holidays receive similar treatment.  Three-day holiday weekends (*e.g.*, with a Monday holiday) precipitate advance determination of a constant Gas Daily price for a four-day period (*e.g.*, Friday trades generate a Gas Daily price for Saturday, Sunday, Monday and Tuesday).

trades for next-day gas delivery to Southern Star – was published at approximately 5:00 pm Central Time on February 16, 2021.  The Platts Gas Daily report, in addition to reporting benchmark Gas Daily prices for each location (which it terms the "midpoint" price), also reports the number and aggregate volumes of the underlying qualifying transactions for each location.

61.     Financial gas transactions can also rely on Platts benchmark Gas Daily. Many financial gas products are priced, valued, and settled based on the Platts Gas Daily, including specific financial gas products tied to the Southern Star Gas Daily prices discussed below in Section IV.D, *infra*.

C.     **The Southern Star Location and its Benchmark Southern Star Gas Daily Price**

62.     The Southern Star Central Gas Pipeline (the "Southern Star Pipeline") is an interstate natural gas pipeline centered in Kansas and extending to Missouri, Oklahoma, Colorado, Wyoming, Texas, and Nebraska.[10]  A map of its approximately 6,000 miles of "mainline" pipe is provided below:

---

[10] The eastern half of Kansas, Missouri and northern Oklahoma constitute the Southern Star Pipeline's "market zone" – the primary population or market centers to which gas is delivered. Remaining areas, including the western half of Kansas, Colorado, Wyoming, northern Texas and Oklahoma, constitute the "production zone" – areas which primarily collect natural gas from producers and/or producing locations, in order to ship it to the market zone or to interconnecting other pipelines.



63.     Platts defines its Southern Star trading location as follows:

**Southern Star, Tx.-Okla.-Kan. (daily and monthly market)**

Deliveries into Southern Star Central Gas Pipeline's system from Hemphill County in the Texas Panhandle eastward, from Carter County in south-central Oklahoma northward, and from Grant County in southwestern Kansas eastward.

Platts Methodology, at 11.

64.     Platts' Southern Star trading location means that Platts' Southern Star location is primarily comprised of (and centered on) the Kansas and Missouri stretches of the Southern Star Pipeline and also includes small segments of the Southern Star Pipeline in Oklahoma and Texas.

65.     All physical natural gas transactions for delivery of natural gas to Southern Star on February 17, 2021 and relying on the Southern Star Gas Daily price used the February 17, 2021

Southern Star Gas Daily price.

66.    Platts' Southern Star Gas Daily prices for each day during February 2021 are set forth below:

| Delivery Date | Southern Star Location |
|---------------|------------------------|
| **Platts Gas Daily Prices** ||
| 2/1/21 | $2.545 |
| 2/2/21 | $2.680 |
| 2/3/21 | $2.820 |
| 2/4/21 | $2.790 |
| 2/5/21 | $2.850 |
| 2/6/21 | $3.560 |
| 2/7/21 | $3.560 |
| 2/8/21 | $3.560 |
| 2/9/21 | $3.655 |
| 2/10/21 | $4.030 |
| 2/11/21 | $9.620 |
| 2/12/21 | $44.780 |
| 2/13/21 | $329.595 |
| 2/14/21 | $329.595 |
| 2/15/21 | $329.595 |
| 2/16/21 | $329.595 |
| **2/17/21** | **$622.785** |
| 2/18/21 | $44.530 |
| 2/19/21 | $7.945 |
| 2/20/21 | $4.385 |
| 2/21/21 | $4.385 |
| 2/22/21 | $4.385 |
| 2/23/21 | $2.690 |
| 2/24/21 | $2.700 |
| 2/25/21 | $2.665 |
| 2/26/21 | $2.465 |
| 2/27/21 | $2.465 |
| 2/28/21 | $2.465 |

**D.      Financial Gas Products (Natural Gas Derivatives) Tied to the Southern Star Gas Daily Price**

67.      The Southern Star Gas Daily price also impacts exchange-traded "financial" natural gas products (*i.e.*, derivatives), including (1) the Southern Star Index Futures contract (ICE symbol: OUI) traded on the ICE Futures U.S. exchange, and cleared by ICE Clear Europe; (2) the Southern Star Swing Futures contract (ICE symbol: OUS) on the ICE Futures U.S. exchange, and cleared by ICE Clear Europe. The Complaint refers to these futures contracts[11] (and all other exchange-traded futures and options contracts whose value and settlement are likewise linked to the Southern Star Gas Daily price), collectively as the "Southern Star Derivatives."

68.      The Southern Star Swing Futures contract (ICE symbol: OUS) is traded on the ICE Futures U.S. exchange, a Designated Contract Market under the CEA registered with and regulated by the CFTC, and cleared by ICE Clear Europe, a Derivatives Clearing Organization registered with the CFTC.[12]  The Southern Star Swing Future is a daily-cash settled futures contract with a set size of 2,500 MMBtu, in which the purchaser pays a fixed price per MMBtu to the seller (*e.g.*, $2/MMBtu, or $200/MMBtu), and receives in exchange, from the seller, the Southern Star Gas

---

[11] A futures contract is a derivative that allows market participants to offset or assume the risk of a price change of an underlying commodity over time. Futures contracts detail the quality and quantity of the underlying commodity, and are standardized to be identical for all participants to facilitate trading on futures exchanges such as ICE. Given the standardization of the contract specifications, the only contract variable is price, which is discovered by bidding and offering (also known as quoting) until a trade occurs. Cash-settled futures contracts result in a cash payment between the futures contract parties reflecting the difference between the originally contracted price of the futures contract and the final market price of the futures contract at the time of settlement. The value of a futures contract fluctuates over time until the expiration date based on fluctuations in the price of the underlying commodity. The fact that futures contracts are standardized and exchange-traded makes these instruments indispensable as means of hedging and speculating by commodity producers, consumers, traders, and investors.

[12] ICE Clear Europe provides clearing services for all futures and options contracts traded on ICE Futures U.S. Energy Division (including all natural gas futures and options) as well as further products traded on various European exchanges operated by ICE.

Daily price per MMBtu, for each day in the contact period (which can be as short as one day and as long as 65 consecutive days).  Put simply, swing futures feature an exchange of a fixed price for a benchmark price (in this instance, the Southern Star Gas Daily price).  A market participant believing that the benchmark price (here, the Southern Star Gas Daily price) will rise during the contract period can seek to speculate on or capture that rise by entering into a swing future.

69.     The Southern Star Index Futures contract (ICE symbol: OUI) is likewise traded on the ICE Futures U.S. exchange and cleared by ICE Clear Europe.  The Southern Star Index Future is a monthly cash-settled futures contract with a set size of 2,500 MMBtu, whose value is a function of the difference between two different Southern Star benchmark prices determined by Platts, namely (1) the FOTM (a/k/a Inside FERC) benchmark price for Southern Star for a given month (or months), calculated by volume-weighted average price of fixed-price next-day natural gas transactions conducted during the last three trading days of the prior month (*e.g.*, January 2021), and (2) the average of all daily Southern Star Gas Daily prices for the same month (or months).  While the FOTM price stays constant for the entire month, the Gas Daily price for each day within the month can fluctuate, depending on the prices and volumes of prior-day qualifying transactions.  The more the Southern Star Gas Daily price *diverges* from the Southern Star FOTM price during the month, the greater the value of the Southern Star Index Future.  A market participant, believing that the Gas Daily price (here, the Southern Star Gas Daily price) will rise and thereby diverge from the constant FOTM price during the contract period, can speculate on the movement of the Gas Daily price through entering into an index future.

E.     **The Southern Star Gas Daily Price is Highly Susceptible to Manipulation**

70.     As explained above, the Platts Gas Daily Methodology provides an average natural gas price within a given location by (1) calculating the volume-weighted average price of (2) all prior-day, fixed-price natural transactions for next-day delivery within the location, transacted on

ICE or reported to Platts.  *See* Section IV.B, *supra*.

71.     The Southern Star Gas Daily price is highly susceptible to manipulation because there are far fewer qualifying transactions each day in Southern Star than in nearly all other Mid-Continent (and U.S.) trading locations – and, relatedly, substantially lower daily qualifying transaction volumes.

72.     In February 2021, qualifying transactions in Southern Star averaged fewer than fifteen per day, with low daily transaction volumes. Other Mid-Continent trading locations during the same time averaged much higher daily qualifying transactions and volumes.

73.     The Southern Star Gas Daily price of $329.595 set for February 13-16, 2021 (a holiday weekend) consisted of seven qualifying transactions on February 12, 2021, totaling 50,000 MMBtu.  The February 17, 2021 Southern Star Gas Daily price, $622.875, was based on only two qualifying transactions on February 16, 2021, totaling only 16,000 MMBtu.

74.     Therefore, in Southern Star generally – and during Winter Storm Uri particularly – the addition of even a single qualifying transaction had a greater ability to materially move the benchmark Gas Daily price than in nearly all other trading locations.

**F.     Winter Storm Uri and Gas Daily Prices**

75.     During approximately February 13-17, 2021, a winter storm traveled from the Pacific Northwest of the U.S. to the Mid-Continent, accompanied by freezing weather ("Winter Storm Uri").  Winter Storm Uri's cold temperatures increased demand for natural gas and, at the same time, constricted gas production and supply.  On February 14, 2021, Kansas's then-Governor Laura Kelly issued a State of Disaster Emergency proclamation, citing the storm's "stress on the energy infrastructure."

76.     These conditions understandably increased natural gas prices during this time. However, the natural gas prices and benchmark prices in multiple Mid-Continent locations – and

Southern Star particularly – were **not** readily understandable but rather, as aptly described by the American Public Gas Association, "unprecedented and *unthinkable*" (*see* ¶ 97, *infra*; emphasis in original).   For example, Southern Star natural gas benchmark prices in early February were approximately $2.50/MMBtu. Still, they spiked during February 13-16, 2021, to levels more than 100 times higher ($329.595/MMBtu) and, on February 17, 2021, to a level more than 200 times higher ($622.785/MMBtu).

77.     These natural gas prices caused many LDCs to incur extraordinarily high natural gas purchase costs for February 2021 – often in excess of, or multiples of, LDCs' **annual** gas purchase costs.

## V.    MACQUARIE ENTERS INTO THE TRADE TO MANIPULATE THE SOUTHERN STAR GAS DAILY PRICE IN VIOLATION OF THE CEA

### A.    Macquarie's February 16, 2021 Trade Was Incorporated into the February 17, 2021 Southern Star Gas Daily Price

#### 1.    Macquarie Entered into the Trade on February 16, 2021

78.      On the morning of February 16, 2021, Macquarie executed a natural gas trade in which Macquarie agreed to purchase natural gas at an inflated fixed price to be delivered to Macquarie on the following day, February 17, 2021 at a Southern Star delivery point known as the Kansas Hugoton Pool (the "Trade"). Macquarie or another party reported the Trade to Platts.

79.     The publication of the Trade (via reporting or other means) was a false signal to others in the market for Southern Star natural gas that the market price for natural gas at that location was much higher than it should have been due to natural market forces. This manipulation of the Southern Star Gas Daily price resulted in an artificial price that was not a true indicator of the market.

### 2.     The Trade was Incorporated into the February 17, 2021 Southern Star Gas Daily Price

80.     The terms of the Trade –a natural gas transaction at a fixed price for the firm, physical next-day delivery within Southern Star – made the Trade a qualifying transaction concerning the February 17, 2021Southern Star Gas Daily benchmark price.

81.     The Trade drove the February 17, 2021 Southern Star Gas Daily price.  The Platts' February 17, 2021 Gas Daily Report shows a Southern Star Gas Daily price of $622.785/MMBtu.

### B.     The Trade Materially Altered the February 17, 2021 Southern Star Gas Daily Price

82.     The Trade materially altered and sharply inflated the February 17, 2021 Southern Star Gas Daily price.

83.     There were only two trades that established the February 17, 2021 Southern Star Gas Daily price, $622.785: the Trade and one other qualifying transaction ("the Other Trade").

84.     Had Macquarie not made the Trade, the February 17, 2021 Southern Star Gas Daily price would have been much lower and only based on the "Other Trade."

85.     The Trade thus elevated the February 17, 2021 Southern Star Gas Daily price far beyond what it would have been absent the Trade.

### C.     The February 17, 2021 Southern Star Gas Daily Price was an Artificial Price

### 1.     The Trade's Price Did Not Reflect, and was Disconnected From, Prevailing Market Forces and Supply/Demand Factors

86.     The extremely high price Macquarie agreed to pay for the gas (and the relatively large volume of gas Macquarie agreed to purchase at that extremely high price) established the Trade's influence on the February 17, 2021 Southern Star Gas Daily price.

87.     The Trade's price and the resulting February 17, 2021, Southern Star Gas Daily price ($622.785/MMBtu) were artificial. Neither price reflected basic supply and demand nor

regular market forces.

88.     The price that Macquarie agreed to pay in the Trade was an off-market price. The Trade is the single highest price paid for Southern Star gas and far exceeds other contemporaneous transactions by Macquarie and others. Reporting the Trade that it would be included in the Southern Star Gas Daily price necessarily signaled to the market that it was representative of the market even though it was not.

89.     Second, the other qualifying transaction on the same day (February 16, 2021) for the exact location (Southern Star) – *i.e.*, the Other Trade – was transacted at a price materially lower than the Trade.  The identity in time, place, and terms shared by the Trade and the Other Trade meant that both were subject to substantially similar market forces and supply and demand factors.  However, the sharply disparate prices at which these two otherwise similar trades were transacted indicate, at best, that only one of these two trade prices reflected those applicable market forces, and the other – far distanced in price – did not.

90.     Third, all available data indicate that the Trade, rather than the Other Trade, was the unrepresentative outlier.

91.     The price of the Other Trade is also consistent with all contemporaneous *non-qualifying* Southern Star transactions currently known to Plaintiff for February 16-17, 2021, while the price of the Trade, again, is not.  Indeed, on February 16, 2021, Macquarie bought Southern Star gas in two separate transactions at fixed prices materially lower than the Trade.

92.     The artificially high price of the Trade, when combined with relatively large volume and the paucity of other qualifying transactions on February 16, 2021 (when there was only one qualifying transaction for Gas Daily pricing other than the Trade), caused the February 17, 2021 Southern Star Gas Daily price to be similarly artificial, pulling the benchmark price far

away from normal otherwise-prevailing market pricing and closer to Trade's price.

> **2.     Market Participant Concerns with Natural Gas Prices During Winter Storm Uri Have Singled Out the February 17, 2021 Southern Gas Daily Price**

93.     Following Winter Storm Uri, natural gas market participants and observers repeatedly expressed concerns with the high prices for Mid-Continent natural gas witnessed during Winter Storm Uri.  Those concerns singled out the February 17, 2021 Southern Star Gas Daily price as an incorrect, off-market price and a locus of potential manipulation.

94.     For example, an April 30, 2021, report authored by Missouri Public Service Commission staff expressed "particular concern" with the February 17, 2021 Southern Star Gas Daily price and suggested that it was not an accurate or representative market price:

> The daily index escalation in price [] is, to the Staff's knowledge, without precedent for interstate pipelines serving Missouri.
>
> **Of particular concern is the price level for the February 17th flow date**. On that day, the published price for gas flowing on Southern Star was $622.785 per MMBtu.…[O]nly two deals with a related volume of 16,000 MMBtu were used to establish the daily index price for February 17th. It is difficult to understand how so few transactions can set the price of a daily index that detrimentally impacts hundreds of thousands of customers. (citations omitted)[13]

95.     At least two market participants, both substantial purchasers of Southern Star gas, made separate complaints to Platts concerning the February 17, 2021 Southern Star Gas Daily price.

96.     Similarly, the American Public Gas Association, on behalf of its 735 members (municipal gas distribution systems, public utility districts, county districts, and other public

---

[13] *See* Staff Report, "In the Matter of The Cause Of The February 2021 Cold Weather Event and Its Impact on Investor Owned Utilities," *Missouri Public Service Commission*, File No. AO-2021-0264 (April 30, 2021), at 61, available at: https://efis.psc.mo.gov/mpsc/commoncomponents/viewdocument.asp?DocId=936353009.

agencies with gas distribution facilities) who principally purchased gas based on benchmark price indices, implored the Federal Energy Regulatory Commission ("FERC") to "specially investigate" and "verify the accuracy" of the "extraordinary prices" exhibited by the benchmarks, particularly the February 17, 2021 Southern Star Gas Daily price:

> The winter storm that brought record sustained cold causing such human misery to Texas also profoundly affected the mid-Continent at the same time. **Natural gas index prices quickly rose to unprecedented and *unthinkable* levels**. . . For the majority of buyers, including APGA members, the daily index was the price paid for incremental quantities purchased in response to the record cold. . .

> What happened in the price indices from Trade Date February 11 through February 19 had an enormous economic impact on consumers and the economies of energy-consuming states—both the direct use of natural gas and gas-fired electric generation. It is almost impossible to overstate these impacts. *For example, some APGA members were compelled to pay for February gas deliveries, which they otherwise would have paid for an entire year*. **Any error or manipulation of those index prices could have translated into billions of dollars.** . . Accordingly, the Commission should scrutinize how the indices behaved during Winter Storm Uri.

> APGA offers below a sampling of indices that affected a number of its members during this period. . .

***

***Southern Star***

| Flow Date(s) | Price | Vol (MMBtu) | Deals |
|---|---|---|---|
| FOM | $   2.520 | 83 | 14 |
| 12-Feb | $  44.789 | 104 | 26 |
| Feb 13-16 | $ 329.595 | 50 | 7 |
| 17-Feb | $ 622.785 | 16 | 2 |
| 18-Feb | $  44.530 | 75 | 13 |

***

Perhaps the highest pipeline penalty ever calculated came during the storm and was on Southern Star Central Gas Pipeline, Inc.—one of the reasons that the pipeline sought the Commission's blessing for it to waive them.   The applicable OFO Penalties under Southern Star's Tariff are calculated at 2.5x the average Gas Daily Index for Southern Star, which peaked during the OFO Period at over $622 per MMBtu. . .

Moreover, this Commission-authorized penalty structure—typical for interstate pipelines—underscores **the necessity for the Commission to verify the accuracy and efficacy of the daily index on which they are based. As noted above, that**

27

**$622 daily index price was developed from only two deals. . . Given these extraordinary prices, the Commission must specially investigate**. (italics in original; bold added for emphasis)[14]

97.    In October 2021, Reuters reported that the U.S. Department of Justice was investigating "suspected manipulation of energy pricing benchmarks published by S&P Global Platts" and "probing suspected manipulative behavior by individual traders when submitting [] deal prices to Platts' price assessments for oil and other energy benchmarks . . ."[15]

**D.    Macquarie Possessed the Ability to Influence Southern Star Gas Daily Prices and Caused the Artificially High February 17, 2021 Southern Star Gas Daily Price**

**1.    Macquarie Possessed the Ability to Influence Southern Star Gas Daily Prices**

98.    Macquarie's sheer size – in North America overall, in the Mid-Continent region, on the Southern Star pipeline, and in Kansas – provided Macquarie with the ability to manipulate benchmark Southern Star Gas Daily price through manipulative trading of Southern Star physical gas.  Moreover, as Southern Star daily benchmark prices were usually determined based on less than 15 Southern Star fixed price trades (*see* Section IV.E, *supra*), Macquarie's local size, resources, and trading activity provided it with adequate resources to influence Southern Star Gas Daily pricing, resources Macquarie and its trader were necessarily aware of at the time of the Trade.

99.    According to Natural Gas Intelligence's ("NGI") analysis of gas marketer sales

---

[14] *See* American Public Gas Association, "Initial Comments of the American Public Gas Association," FERC Docket No. PL20-3-000 (March 22, 2021), at 4-6 and 9, available at: https://www.apga.org/viewdocument/apga-comments-on-ferc-actions-regar.

[15] *See* Chris Prentice and Jody Godoy, "Exclusive:  U.S. Justice Department Probes Suspecting Manipulation of Platts Benchmarks," *Reuters* (Oct. 4, 2021), available at: https://www.reuters.com/business/energy/exclusive-us-justice-department-probes-suspected-manipulation-platts-benchmarks-2021-10-04/.

volumes for the first calendar quarter of 2021, Macquarie was the second largest natural gas marketer in North America during that period, delivering 11.20 billion cubic feet of natural gas to its customers and counterparties each day.[16]

| | **NGI's TOP NORTH AMERICAN GAS MARKETERS** 1Q21 (Bcf/d) | | | |
|---|---|---|---|---|
| | **Company** | **1Q2021** | **1Q2020** | **Change** |
| 1 | **BP plc** | 15.94 | 19.83 | -20% |
| 2 | **Macquarie Energy** | 11.20 | 11.79 | -5% |
| 3 | **Tenaska** | 11.10 | 10.70 | 4% |
| 4 | **Shell Energy NA** | 10.70 | 10.00 | 7% |
| 5 | **ConocoPhillips** | 10.10 | 8.49 | 19% |
| 6 | **Direct Energy** | 7.95 | 7.94 | 0% |
| 7 | **Sequent Energy Management** | 7.10 | 6.90 | 3% |
| 8 | **J. Aron & Co.** | 4.94 | 5.60 | -12% |
| 9 | **EQT Corp.** | 4.34 | 4.12 | 5% |
| 10 | **Chevron Corp.** | 3.91 | 4.36 | -10% |
| 11 | CIMA ENERGY LP | 3.88 | 3.67 | 6% |
| 12 | Symmetry Energy Solutions LLC | 3.77 | N/A | N/A |
| 13 | EDF Trading NA | 3.73 | 4.44 | -16% |
| 14 | Antero Resources Corp. | 3.37 | 3.12 | 8% |
| 15 | CFEI | 3.31 | N/A | N/A |
| 16 | Castleton Commodities | 3.30 | 3.65 | -10% |
| 17 | ExxonMobil | 2.98 | 3.14 | -5% |
| 18 | ARM Energy Management | 2.32 | 3.16 | -27% |
| 19 | Cabot Oil & Gas Corp. | 2.29 | 2.36 | -3% |
| 20 | Southwestern Energy Co. | 2.14 | 1.56 | 37% |
| 21 | Hartree Partners | 2.13 | 2.05 | 4% |
| 22 | Canadian Natural Resources Ltd. | 1.59 | 1.41 | 13% |
| 23 | Ovintiv | 1.58 | 1.57 | 1% |
| 24 | NJR Energy Services Co. | 1.29 | 1.76 | -27% |
| 25 | Goodrich Petroleum Co. | 1.10 | 1.20 | -8% |
| | **Total** | **126.06** | **N/A** | **N/A** |

100.    During the relevant period, Macquarie had a leading presence as a natural gas marketer in the Mid-Continent region, on the Southern Star pipeline, and in Kansas.

101.    In Kansas, Macquarie was one of the largest gas suppliers to Kansas' main gas

---

[16] For each quarter between 2020 and the present for which NGI rankings are available, Macquarie invariably ranked among the top five natural gas marketers in North America.

utilities – KGS, and KMGA, Black Hills Energy, and MidWest Energy, Inc.[17]

102.   Macquarie maintained a leading presence on the Southern Star pipeline and as a trader of Southern Star gas. Macquarie was responsible for a significant percentage of all such sales and purchases during February 2021 (by volume).

103.   Macquarie's market share of qualifying transactions for Southern Star Gas Daily pricing, indicates that Macquarie could influence Southern Star Gas Daily pricing, including through purchasing Southern Star gas at fixed prices for next-day delivery.

### 2.   Macquarie Intentionally Caused an Artificially High February 17, 2021 Southern Star Gas Daily Price

104.   Macquarie had motive to inflate the benchmark Southern Star Gas Daily February 17, 2021 price because Macquarie was (and knew it would be) a net seller of physical natural gas priced at (or impacted by) that benchmark.

105.   Macquarie's market power on the Southern Star pipeline afforded it the opportunity to extract uneconomic profits using fixed price trades, such as the Trade, to influence benchmark prices higher, in favor of its market position.

106.   As a large net seller of natural gas tied to the February 17, 2021 Southern Star Gas Daily price, Macquarie stood to benefit from the higher benchmark price and thus had the motive to lift that benchmark price higher.

107.   The spike in the February 17, 2021 Southern Star Gas Daily prices engendered by the Trade positioned Macquarie to receive an additional profit, based on its short and long term

---

[17] Macquarie was also one of the five largest suppliers of gas to Oklahoma's utilities. *See* Jack Money and Dale Denwalt, "Who got paid during the February 2021 storm? More than 65 Oklahoma companies split a $3 billion+ pot," *The Oklahoman* (Feb. 10, 2022) (compiling and analyzing data submitted to the Oklahoma Corporation Commission's Public Utility Division), available at: https://www.oklahoman.com/story/business/energy-resource/2022/02/10/data-submissions-contextualize-utilities-winter-storm-costs/6723584001/.

contracted trading volumes for February 17, 2021 Southern Star gas at the Gas Daily price and delivered volumes of spot purchases of gas.

108.    Put simply, by entering into the Trade, Macquarie's manipulation of the benchmark February 17, 2021 Southern Star Gas Daily price materially benefited Macquarie while harming others depending on the gas distributed on the Southern Star pipeline, including many Kansans.

109.    The incremental benefits Macquarie obtained by the effect of the Trade on these other trades more than offset any losses Macquarie incurred on the Trade itself, notwithstanding the uneconomical price Macquarie agreed to pay in the Trade.

110.    These facts strongly indicate that Macquarie was not only aware of the impact the Trade would have on the market, including on downstream purchasers of gas from the Southern Star Pipeline, but intended the results of the Trade – namely, a manipulated benchmark price that dramatically affected the market and falsely signaled to the market that the Trade price was the product of market forces.

### E.    Macquarie's Extraordinary Profits from February 2021 Gas Transactions Utterly Transformed MGL's Fiscal 2021 Results

111.    MGL operates and reports based on a fiscal year ending on March 31.  MGL's 2021 fiscal year ended on March 31, 2021 ("Fiscal 2021").

#### 1.    On February 9, 2021, Just Days Prior to Winter Storm Uri, MGL Warned that it Expected Fiscal 2021 Profits to Decline

112.    On February 9, 2021 (shortly before Fiscal 2021's end), MGL provided an "Operational Briefing," including a press release, investor presentation, and an analyst conference call hosted by MGL's CEO, CFO, and several MGL group operating heads, in which MGL warned that it then expected Fiscal 2021 results "to be slightly down" from prior-year fiscal 2020 results. *See* February 9, 2021 MGL Operational Briefing press release; Operational Briefing presentation, at 20.  MGL warned that results for its CGM division (in which Macquarie was housed) during the

second half of 2021 were expected to be "slightly down" from the first half of 2021.  *See* Operational Briefing presentation, at 19; Operational Briefing conference call, transcript at 8. MGL also reported that CGM results for the first three quarters of Fiscal 2021 were "broadly in line" with results from the prior-year period (*i.e.*, the first three quarters of fiscal 2020). Operational Briefing conference call, transcript at 3.

113.    MGL's February 9, 2021 warnings were made: (1) with MGL's results for the third quarter of Fiscal 2021 (ended December 31, 2020) in hand, and with interim results from the first month of Fiscal 2021's fourth quarter (*i.e.*, January 2021 results);[18] (2) with slightly less than two months remaining in Fiscal 2021; and (3) just days before natural gas price spikes hit Southern Star and other adjacent Mid-Continent locations.

> **2.    On February 22, 2021, Just Days After Winter Storm Uri and Less Than Two Weeks After Warning that Profits Would Decline, MGL Revised its 2021 Profit Outlook to a 10% *Increase***

114.    However, just two weeks after issuing these warnings, and just days after the natural gas price spikes at Southern Star and other Mid-Continent locations subsided, MGL issued a revised – and utterly reversed – Fiscal 2021 outlook.  In a February 22, 2021 press release titled "Macquarie Group Provides Update to Short Term Outlook," MGL announced that it now expected Fiscal 2021 financial results not to be "slightly down" from fiscal 2020, but instead "to be up approximately 5% to 10%" versus fiscal 2020.

> **3.    Macquarie's Natural Gas Trading During Winter Storm Uri Generated Net Profits to MGL Nearing $A1 Billion and Reversed the Earnings Warning**

115.    MGL's February 22, 2021 press release left no doubt as to what had caused MGL's

---

[18] *See* Operational Briefing conference call, transcript at 11 (discussing January 2021 operations and results).

yearly results to swing from a slight loss to a substantial profit in a mere two weeks, explaining that:

> Extreme winter weather conditions in North America have significantly increased short-term client demand for Macquarie's capabilities in maintaining critical physical supply across the commodity complex and, particularly in relation to gas and power.
>
> Macquarie's Commodities and Global Markets (CGM) business physically ships gas on most major pipelines across the U.S. and, over time, has built capacity to support clients by delivering power and physical commodities to help them meet the unexpected needs of their customers.

116.    As Reuters reported on the same day, "Macquarie Group earned big profits off the winter storms sweeping across [] U.S. states, with the gains from its trading operations changing the Australian banks' outlook for the year.  The company is the second-largest gas marketer in North America behind oil major BP, and the week of big trading revenue has boosted the bank's overall profit for the year by 10%."[19]

117.    On May 7, 2021, MGL reported its Fiscal 2021 results via a press release, investor presentation, conference call with analysts and investors hosted by MGL's CEO and CFO, and publication of MGL's annual report.  Consistent with the reversal of fortune reported on February 22, 2021, MGL reported Fiscal 2021 profits exceeding $A3.0 billion, marking a 10% increase over fiscal 2020.

118.    MGL attributed CGM's extraordinary performance during the fourth quarter of Fiscal 2021 to, in largest part, Macquarie's February 2021 activities in trading physical and financial commodities (which MGL termed "inventory management and trading") and further

---

[19] *See* Paulina Duran and Jonathan Barrett, "Australia's Macquarie Reaps Windfall Profits from U.S. Winter Freeze," *Reuters* (Feb. 22, 2021), available at: https://www.reuters.com/article/us-macquarie-group-outlook/australias-macquarie-reaps-windfall-profits-from-u-s-winter-freeze-idUSKBN2AM01O.

financial commodities trades (which MGL referred to, somewhat obliquely, as "risk management"),[20] and particularly, in U.S. physical and financial gas:

> CGM delivered a net profit contribution of $A2,601 million, up 50% from $A1.738 million FY 20. The result was driven by increased revenues throughout the year across the Commodities platform with strong risk management results across Resources, North American Gas and Power, EMEA Gas and Power and Agriculture. Inventory Management and Trading was up across multiple sectors with improved results in Oil, North American Gas and Power and Precious Metals. (May 7, 2022 MGL press release, at 2.)

***

> **[MGL] Income Statement Key Drivers**
>
> Net interest and trading income of $A5,677m, up 20% on FY 20
>
> **Higher income in CGM mainly driven by Inventory management and trading in North American Gas and Power**, Oil and Precious Metals due to market dislocations. . . (MGL May 7, 2022 presentation, at 26)

***

> **CGM**
>
> **(iii) Inventory management and trading**
>
> **Inventory management and trading income of $A976 million for the year ended 31 March 2021 increased significantly from $A178 million in the prior year driven by market dislocations and increased volatility. Increased contributions were recorded in North American Gas and Power**, Oil and Precious Metals, with North American Gas and Power impacted by increased volatility primarily associated with extreme weather conditions in 4Q21. (MGL May 7, 2022 "Macquarie Group Management Discussion & Analysis" report, at 19) (emphasis added)

***

> **Commodities and Global Markets – Key Drivers**
>
> Commodities

---

[20] *See e.g.* MGL May 7, 2021 "Macquarie Group Management Discussion & Analysis" report, at 19 ("**Commodities. (i) Risk management products**. Income from risk management products is generated from the provision of hedging and risk management services to clients.")

Increased Risk Management revenue across the commodities platform driven by increased contributions from Resources, North American Gas and Power, EMEA Gas and Power and Agriculture due to increased client activity. . .

Increased opportunities across multiple sectors in inventory management and trading driven by market dislocations and increased volatility. Strong results were recorded in Oil, North American Gas and Power, and Precious Metals. . . (MGL May 7, 2022 presentation, at 33) (emphasis added)

119.    More particularly, MGL revealed on May 7, 2021 that CGM Fiscal 2021 net profits totaled $A2.60 billion, up 50% from $1.74 billion in fiscal 2020. *See* MGL May 7, 2022 press release, at 2.  Given that results from the first three quarters had been left 2021 flat with 2020, the entire Fiscal 2021 uplift of nearly $A1 billion (specifically, $A860 million) was generated solely by CGM's results in the fourth quarter of Fiscal 2021 – *i.e*., January-March 2021.

120.    Astoundingly**,** CGM's Fiscal 2021 net profits from "Inventory management and trading" (*i.e*., physical and financial commodities activities) neared $A1 billion (specifically, $A976 million) – more than quintupling MGL's fiscal 2020 net profits from the same activities ($A178 million).  Further, Fiscal 2021 net profits from "risk management" (financial commodities activities) reached $A1.46 billion, an increase of $A167 million over fiscal 2020 "due to increased client hedging activity as a result of volatility and commodity price movements." *Id*.

121.    Indeed, incremental CGM 2021 net profits from commodities "inventory management and trading" ($A798 million) and additional financial commodities "risk management" ($A167 million) accounted for more than 100% of CGM's Fiscal 2021 improvement over fiscal 2020 (offset by Fiscal 2021 declines in other CGM product lines). *See* MGL May 7, 2022 presentation, at 33 and 58.

122.    Notably, MGL executives, in announcing MGL's Fiscal 2021 results on May 9, 2022, repeatedly warned that they expected CGM's net profits for fiscal 2022 "to be significantly down on FY 21." *See* MGL May 7, 2022 conference call, transcript at 20, 29-30.  In so doing, they

admitted the obvious fact that CGM's Fiscal 2021 was an extraordinary year:

> Brendan Sproules (Citibank analyst):
>
> Good morning team. Look, I just have a couple of questions on your commodities outlook for the next 12 months. Just looking at the three components of revenue that you give us. The inventory management and trading obviously was close to a billion dollars this year. Is there anything you are seeing in 2022 that suggests that that won't revert back to what has been the longer-term average at around that $A200 million revenue.
>
>                               ***
>
> Alex Harvey (MGL CFO):
>
> . . . Yes more generally obviously we are saying commodities will be significantly down and that's a reflection of the fact that we did see broad dislocation across the commodities' platform through FY21 and as we're sitting here today, obviously markets are starting to normalise a little bit from where they were. So looking out here, we're expecting, from here, we're expecting commodities to be significantly down. . .
>
> Shemara Wikramanayake (MGL CEO):
>
> Yes. I mean to your question, this was a particularly strong year for us in inventory management and trading.

*See* MGL May 7, 2022 Conference Call, transcript at 29-30.

      123.    However, Macquarie executives did not delve too deeply, in public, into just how extraordinary CGM's Fiscal 2021 year really was. As the above allegations indicate, CGM's Fiscal 2021 appeared entirely ordinary through early February 2021 (*i.e.*, ten and half months into the 12-month period), at which point it was flat with fiscal 2020. Then, during two truly extraordinary weeks in mid-February 2021, CGM generated four years' worth of net profits (*i.e.*, $A800 million in incremental Fiscal 2021 net profits, when CGM averaged annual net profits of approximately of $A200). **These four years' worth of CGM net profits were generated, in largest part, by a tiny part of CGM: Macquarie**.

      124.    Viewed in combination, the above facts tell a straightforward story: (1) MGL's

swing from a Fiscal 2021 net profit decline (per February 9, 2021 projections) to a Fiscal 2021 net profit increase of 10% (per February 22, 2021 projections two weeks later, and May 7, 2021 announced results), (2) was underwritten by a spike in CGM net profits, that (3) occurred not merely in the fourth quarter of Fiscal 2021, but (4) more precisely, during the middle two weeks of February 2021, (5) driven in largest part by Macquarie's physical gas trading activities.

## VI.   MACQUARIE'S MANIPULATION HARMED KANSAS RESIDENTS

### A.   Macquarie's Manipulation Forced Kansas Residents to Pay More for Natural Gas

125.    In March 2021, the costs resulting from elevated natural gas prices during February 2021 (hereinafter, "Excess Costs") began to come due as natural gas users and purchasers began to receive extremely large invoices from their gas suppliers for the gas they purchased or used during February 2021.

126.    For example, Macquarie had term contracts with the KMGA (a Kansas political subdivision within the meaning of the KFCA) that obligated KMGA to purchase gas from Macquarie at a price based on the Southern Star Gas Daily price. KMGA received invoices from Macquarie that included charges for gas purchased based on the false, artificially high February 17, 2021 Southern Star Gas Daily price caused by Macquarie. In so doing, Macquarie's invoices were false claims submitted to KMGA. KMGA paid the invoices presented to it by Macquarie and was damaged thereby. Discovery may reveal others similarly harmed.

127.    Many of these Excess Costs may have been the unfortunate result of regular market forces rather than actionable misconduct.  However, a specific and *specifically identifiable* subset of Kansans' Excess Costs is directly traceable to, and was directly caused by, Macquarie's manipulation of the February 17, 2021 Southern Star Gas Daily price.

128.    The volumes of natural gas delivered on February 17, 2021 – and priced based on

the February 17, 2021 Southern Star Gas Daily price – to Kansas' principal gas utilities (KGS, Atmos, and Black Hills), a Kansas municipal gas-purchasing agency (KMGA) and one Kansas electricity generator (MidWest Energy) were material.

129.    Excess Costs flowed to Kansas residents via three basic and distinct streams:  (1) through utilities and similar entities that purchased natural gas and who necessarily passed their costs on to residential Kansas ratepayers via multi-year increases in their approved rates;[21] (2) through local natural gas marketers who purchased natural gas for, and passed their purchase costs on immediately to, their Kansas non-residential customers (primarily, small- and mid-sized commercial, municipal, governmental and other non-residential organizations), via February 2021 invoices; and (3) to certain large commercial and industrial entities, who purchased natural gas directly (rather than obtaining it from utilities or local marketers), in February 2021 invoices.

130.    Based on currently available and partial data for only the first of these three Excess Cost streams (through utilities and similar entities to Kansas ratepayers), Macquarie's misconduct was responsible for illegitimately causing more than $50 million of Kansans' Excess Costs.

---

[21] Utilities paid their February 2021 gas invoices from their gas suppliers, which were often tens of millions of dollars higher than normal – and occasionally more than $100 million dollars higher – promptly.  Utilities then sought to recapture their February 2021 Excess Costs from their ratepayers, by seeking state utility regulators' approval to charge ratepayers new, increased rates. Because utilities' Excess Costs were so high, the new rates sought and approved were designed to allow utilities to recapture their Excess Costs through increased rates paid out over lengthy multi-year periods (*e.g.*, five years, seven years, etc.), rather than all at once.  While spreading out ratepayer repayment of Excess Costs over such long periods had the intended effect of minimizing increases to ratepayers' *monthly* bills, ratepayers were still responsible for full repayment of utilities' Excess Costs.  In Kansas, in proceedings before the Kansas Corporation Commission ("KCC") for regulatory approval of new and higher rates to recapture Kansas utilities' Excess Costs, the KCC required utilities and other regulated entities to quantify their Excess Costs, and approved new rates only to reflect prudently-incurred Excess Costs.  Detailed and comprehensive February 2021 gas purchase data provided in the KCC proceedings by some, but not all, of the Kansas utilities forms the basis for Plaintiff's analysis. Similar proceedings and Excess Cost determinations occurred in neighboring states, including Oklahoma, Minnesota and Missouri.

Complete data for all three streams of Excess Cost is expected to reveal substantial further volumes of Kansas natural gas priced based on the February 17, 2021 Southern Star Gas Daily price and thus reveal the aggregate harm to Kansas residents to be far larger.

### B.    Macquarie's Manipulation Harmed Traders of Southern Star Derivatives

131.    Macquarie's trading of physical gas (*i.e.*, the Trade) was intended to manipulate, or at least recklessly manipulated, the benchmark Southern Star Gas Daily price for February 17, 2021 upward. This manipulation, in turn, directly and necessarily harmed traders in Southern Star Derivatives, including, specifically: (1) sellers of Southern Star Swing Future contracts whose contract period included February 17, 2021, and (2) sellers of Southern Star Index Future contracts whose contract period included February 2021.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq*.,
and Rule 180.2 Promulgated Thereunder
Against Macquarie**

132.    Plaintiff repeats and re-alleges the foregoing allegations herein.

133.    Macquarie, through its acts as alleged herein, including the acts of its agent Macquarie Trader A, specifically intended to and did manipulate, or at least acted recklessly with regards to manipulating, the Southern Star Gas Daily price on February 16 and 17, 2021 and the prices of the following commodities and futures in violation of the CEA, 7 U.S.C. §§1 *et seq*.: (1) natural gas delivered within Southern Star on February 17, 2021 and priced at the Southern Star Gas Daily price; (2) the Southern Star Index Futures contract traded on ICE (ICE symbol: OUI); (3) the Southern Star Swing Futures contract traded on ICE (ICE symbol: OUS); and (4) additional Southern Star Derivatives linked to the February 17, 2021 Southern Star Gas Daily price.

134.     As alleged herein, Macquarie could influence the February 17, 2021 Southern Star Gas Daily price, and thus the settlement prices of the aforementioned Southern Star Derivatives contracts linked to that price.  Macquarie had the opportunity to create, and successfully created, an artificial February 17, 2021 Southern Star Gas Daily price by entering into the economically irrational Trade at an elevated, off-market price (the single highest price ever paid for natural gas in Southern Star) and without commercial rational purpose other than manipulating the Southern Star Gas Daily price upward.

135.     Macquarie was motivated to do so to benefit (1) its position as a substantial net seller of gas for February 17, 2021, delivery within Southern Star and priced at the Southern Star Gas Daily price, and (2) any further positions Macquarie had taken in the aforementioned Southern Star Derivatives that were priced or settled based on the February 17, 2021 Southern Star Gas Daily price.

136.     Macquarie's conduct and trading activity of natural gas in interstate commerce alleged herein constituted manipulation of the February 17, 2021 Southern Star Gas Daily price used to price/settle (1)  natural gas delivered within Southern Star on February 17, 2021 and priced at the Southern Star Gas Daily price, and (2) the aforementioned Southern Star Derivatives, in violation of the CEA, including but not limited to 7 U.S.C. §§ 6b(a), 6c(a), 9(1), 9(3), and 13(a)(2), as well as 17 C.F.R. § 180.2.

137.     Macquarie's manipulative conduct and trading activity deprived Kansas residents of a lawfully operating natural gas market.

138.     As a direct result of Macquarie's unlawful conduct, Kansas residents suffered actual damages, legal injury, and injury in fact when they transacted in or paid for physical natural gas priced at the February 17, 2021 Southern Star Gas Daily price and in transacting Southern Star

Derivatives linked to the February 17, 2021 Southern Star Gas Daily price at artificial and manipulated prices created by Macquarie, to which Kansas residents would not have been subject but for Macquarie's unlawful conduct alleged herein.

139.    Because Macquarie's conduct was willful and intentional, Plaintiff is entitled to additional punitive or exemplary damages equal to no more than two times the actual damages for the violations of the CEA alleged herein.

## SECOND CLAIM FOR RELIEF

### Employing a Manipulative and Deceptive Device
### in Violation of the CEA 7 U.S.C. §§ 1 et *seq*. and Rule 180.1(a) Promulgated Thereunder
### Against Macquarie

140.    Plaintiff repeats and re-alleges the foregoing allegations herein.

141.    Macquarie intended to affect or acted recklessly with regards to affecting prices of physical and financial gas contracts priced at based on, or linked to, the February 17, 2021 Southern Star Gas Daily price, and engaged in overt acts beginning no later than February 16, 2021, in furtherance of its intent.

142.    As alleged herein, Macquarie, by entering into the Trade and thereby inflating the February 17, 2021 Southern Star Gas Daily price: (1) intentionally or recklessly used or employed a manipulative device or artifice to defraud; (2) engaged in an act, practice or course of business which operated or would operate as a fraud or deceit upon Kansas residents transacting in or paying for physical or financial gas products linked to the February 17, 2021 Southern Star Gas Daily price; (3) caused the delivery, through communication and interstate commerce, of a false or misleading or inaccurate report concerning market information or conditions affecting the price of a commodity; and (4) entered into a transaction involving the purchase or sale of a commodity for future delivery that was used to cause a price to be reported or recorded that was not a true and

bone fide price, all in violation of the CEA, including but not limited to 7 U.S.C. §§ 6b(a), 6c(a), 9(1), and 13(a)(2), and Regulation 180.1(a), 17 C.F.R. § 180.1(a).

143.  Macquarie's conduct proximately caused injury to Kansas residents when they transacted in or paid for physical natural gas priced at the February 17, 2021 Southern Star Gas Daily price or transacted in Southern Star Derivatives linked to the February 17, 2021 Southern Star Gas Daily price, at artificial and manipulated prices created by Macquarie.

144.  Plaintiff is entitled to actual damages sustained by Kansas residents from physical and financial gas products priced or settled based on the February 17, 2021 Southern Star Gas Daily price for the violations of the CEA alleged herein.

### THIRD CLAIM FOR RELIEF

**Principal-Agent Liability**
**in Violation of the CEA 7 U.S.C. §§ 1 et *seq*.**
**Against Macquarie**

145.  Plaintiff repeats and re-alleges the foregoing allegations herein.

146.  Macquarie, through its employees, agents, or others (including but not limited to Macquarie Trader A), directed, developed, executed, and otherwise acted with respect to the scheme alleged herein. Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), Macquarie is liable for the acts of its employees, agents and other persons acting within the scope of their employment for Macquarie.

147.  Plaintiff is entitled to damages for the violations alleged herein.

### FOURTH CLAIM FOR RELIEF

**Submission of False Claims to Kansas or a Kansas Political Subdivision in Violation of the**
**Kansas False Claims Act, K.S.A. § 75-7501 *et seq*.**
**Against Macquarie**

148.  Plaintiff repeats and re-alleges the foregoing allegations herein.

149.    KMGA, a Kansas political subdivision within the meaning of the KFCA, contractually obligated itself to purchase gas from Macquarie on February 17, 2021, at a price based on the Southern Star Gas Daily Price.

150.    As described above, Macquarie's manipulation of the Southern Star Gas Daily price resulted in a false, inflated price for natural gas that was not based on natural market forces.

151.    Macquarie knowingly presented to the KMGA invoices for Southern Star natural gas for February 2021, including gas purchased on February 17, 2021, at a falsely inflated price.

152.    Alternatively, even if Macquarie intended to manipulate the Southern Star Gas Daily price but did not intend to submit an invoice to KMGA containing the falsely inflated price for gas purchased on February 17, 2021, Macquarie now knows that the invoices submitted to KMGA were based on a false, artificially high price and has not disclosed the false claim or made satisfactory repayment arrangements.

153.    KMGA paid the invoices presented to it by Macquarie and was damaged thereby.

154.    Under the Kansas False Claims Act, Macquarie is liable to the state or affected political subdivision for up to three times the damages sustained, civil penalties, and all reasonable costs and attorneys' fees incurred in a civil action brought to recover any of those penalties or damages.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    That the Court enter an order declaring that Macquarie's actions, as set forth in this Complaint, violate the CEA and the Kansas False Claims Act;

(b)    That the Court award Plaintiff damages, punitive and exemplary damages, or restitution in amount to be determined at trial;

(c)    That the Court award Plaintiff pre- and post-judgment interest at the maximum rate

allowable by law;

       (d)     That the Court award Plaintiff its costs of suit, including reasonable attorneys' and experts' fees and expenses; and

       (e)     That the Court award any and all such other relief as the Court may deem just and proper.

## IX.    JURY TRIAL DEMANDED

       Plaintiff hereby demands a trial by jury.

                            Respectfully submitted,

                            **KRIS W. KOBACH**
                            **KANSAS ATTORNEY GENERAL**

                            **Frances R. Oleen, KS #17433**
                            **Deputy Attorney General**

                            **Melanie Jack, KS #13213**
                            **First Assistant Attorney General**
                            Public Protection Division
                            120 S.W. 10th Avenue, Second Floor
                            Topeka, Kansas 66612-1597
                            Phone (785) 296-3751
                            Fax (785) 291-3699
                            fran.oleen@ag.ks.gov
                            melanie.jack@ag.ks.gov

                            and

                            By:/s/ *Jonathan Musch*
                            Jonathan Musch, D. Kan. No. 79075
                                   MO #55200
                            Special Assistant Attorney General
                            Hilgers Graben PLLC
                            6 Cardinal Way, Suite 900
                            St. Louis, MO 63102
                            Phone (314) 464-3391
                            Fax (402) 413-1880
                            jmusch@hilgersgraben.com

                            and

Alice S. LaCour, *pro hac vice forthcoming*
Special Assistant Attorney General
Grant Schmidt, *pro hac vice forthcoming*
Hilgers Graben PLLC
7859 Walnut Hill Lane, Suite 335
Dallas, TX 75230
Phone (203) 807-4813
alacour@hilgersgraben.com
gschmidt@hilgersgraben.com